FILED
NOV 17 2016
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

## AFFIDAVIT

I, Peggy A. Roberts, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

2:16 MJ464

1. I am a Special Agent (SA) with Homeland Security Investigations (HSI), and have been so for over fifteen (15) years. Over the course of my career with Homeland Security Investigations, I have conducted numerous investigations involving but not limited to: fraud, counter proliferation, worksite enforcement, smuggling, and trafficking including human trafficking relating to violations of (Title) 18 United States Code (U.S.C.) Sections 1589 (forced, defrauded, and/or coerced labor) and 1591 (forced, defrauded, and/or coerced sex).

2. Previous to my career with HSI, I served as a Probation Officer for nine (9) years for the states of Florida and Ohio, which involved the supervision of thousands of convicted felons over the course of my career as a Probation Officer, and included numerous criminal investigations relative to this population.

3. The information contained in this affidavit is based on personal knowledge and experience, review of documents, observations, and information conveyed to me by other individuals, including information obtained from other law enforcement agencies.

4. Because this affidavit is submitted for the limited purpose of establishing probably cause in support of the application for an arrest warrant, this affidavit does not set forth each and every fact learned by me or observed by me during the course of this investigation.

5. This affidavit includes only the facts I believe are necessary to establish probable cause to believe, DEVON JAY CALDWELL committed violations of 18 U.S.C. § 1591, Sex Trafficking by Force, Fraud, or Coercion; and Conspiracy to Engage in Sex Trafficking by Force, Fraud, and Coercion, in violation of 18 U.S.C. § 1594(c).

### LEGAL AUTHORITY

6. Title 18, United States Code, Sections 1591(a)(1), in pertinent part, makes it a criminal offense to knowingly in or affecting interstate or foreign commerce, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person, knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, or any combination of such means will be used to cause the person to engage in a commercial sex act. "Coercion" is defined by Title 18, United States Code, Section 1591(e)(2) to mean: (A) threats of serious harm to or physical restraint against any person; (B) a scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process. Title 18, United States Code, Section 1591(e)(4) defines "serious harm" to mean any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel

a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

7. Title 18, United States Code, Section 1594(c) prohibits a person from conspiring with another to violation Title 18, United States Code, Section 1591.

## BACKGROUND OF THE INVESTIGATION AND FACTS SUPPORTING PROBABLE CAUSE

### A. Jane Doe 1

8. On August 22, 2016, Jane Doe 1 traveled to the Virginia Beach Police Department (VBPD) to report that she had been forced to engage in commercial sex acts by DEVON JAY CALDWELL and others.

9. Jane Doe 1 stated that she met CALDWELL through her ex-boyfriend and CALDWELL's cousin, D.W., at a hotel at the Virginia Beach Oceanfront in the spring of 2016. Both D.W. and CALDWELL encouraged Jane Doe 1 to begin engaging in commercial sex acts and facilitated her prostitution by posting advertisements for her services on Backpage.com. Jane Doe 1 performed commercial sex acts at D.W.'s direction at hotels in Virginia Beach and elsewhere. She provided all the money she earned from her appointments to D.W. Jane Doe 1 explained that D.W. was often physically violent with her, including throwing her into walls and punching her. During the time she worked for D.W., Jane Doe 1 frequently saw CALDWELL at the same hotels where she was performing commercial sex acts for D.W., and stated that CALDWELL had several girls "working" for him.

10. In May 2016, Jane Doe 1 and D.W. had a verbal and physical altercation, after which D.W. told her she was being sold to CALDWELL for $200. CALDWELL took Jane Doe 1 to a hotel in Virginia Beach and began facilitating her commercial sex acts by posting her on Backpage.com. Jane Doe 1 worked for CALDWELL for approximately three months. During that time, she estimated that approximately 8 to 10 other women worked for him as well.

11. After posting advertisements for Jane Doe 1, CALDWELL communicated with commercial sex customers (whom CALDWELL called "plucks") to arrange appointments, provided Jane Doe 1 with condoms for her use with "plucks," and made arrangements to rent rooms in hotels for the group's use. CALDWELL also arranged transportation for Jane Doe 1 to take "out-call" appointments – commercial sex acts at a location other than the hotel where the group was staying. Jane Doe 1 stated that she took appointments at hotels and other locations in Virginia Beach, Norfolk, Newport News, and elsewhere in Hampton Roads.

12. CALDWELL required Jane Doe 1 to take a minimum of five "plucks" per night, ranging from 15 minute "quick visits" to one-to-two hour appointments. CALDWELL set the prices for her appointments, which ranged from $50 for a "quick visit" to $200-$300 for an hour-long appointment. At the end of each appointment, CALDWELL would collect all the money Jane Doe 1 had earned. She was not allowed to keep any of it. CALDWELL did provide her with food, a hotel room to sleep in, clothes as needed, and also regularly supplied her with drugs.

Jane Doe 1 stated that CALDWELL made money by selling drugs in addition to the money he made through the women's commercial sex acts.

13. Jane Doe 1 stated that prior to meeting CALDWELL, she had used marijuana, but that during the time she worked for CALDWELL, he encouraged her and several other women working for him to use other illicit drugs – including cocaine, methamphetamine, heroin (which he called "dog food"). Jane Doe 1 explained that CALDWELL would provide her and the other women drugs prior to their commercial sex appointments, as well as at the conclusion of the appointments as a reward. Jane Doe 1 stated that she gradually began using larger quantities of drugs to help her mentally cope with the situation.

14. Jane Doe 1 stated that CALDWELL directed her to call him "Dad," and that she and others also referred to him as "John John," "Buzzo," or "Devo."

15. Jane Doe 1 explained that if she did not meet her quota of "plucks," or if CALDWELL was not pleased with her, he would not allow her to take a shower, would withhold food from her, and would require her to stay awake until she completed her appointments. She was not afforded days off unless her genitals were swollen. CALDWELL would also occasionally force her to take drugs. Jane Doe 1 detailed that on one occasion, CALDWELL and two other individuals held her (Jane Doe 1) down and injected her with "dog food."

16. On one occasion, CALDWELL told Jane Doe 1 that if she did not obey him, he would "smoke [her] family." Jane Doe 1 understood that to mean that he would shoot her family members.

17. Jane Doe 1 knew CALDWELL to possess three guns over the course of her time working for him. CALDWELL would place a gun under the mattress in the room where she and the other women were to take appointments. Further, CALDWELL would often carry a gun on his person during the "plucks," and would station himself in an adjoining room for security purposes.

18. On August 19, 2016, Jane Doe 1 ran away from a Newport News hotel where she had been working for CALDWELL and a co-conspirator for approximately three days.

B. **Virginia Beach Police Department Follow-On Investigation**

19. After interviewing Jane Doe 1, VBPD Vice Detectives, working in an undercover capacity began targeting CALDWELL and several other individuals suspected of running an organized prostitution ring in Virginia Beach and other cities in Hampton Roads.

20. On August 30, 2016, an undercover VBPD Detective placed a telephone call to phone number 757-XXX-1876, which was listed in an Backpage.com advertisement posted under the Virginia Beach escorts section. An agreement of $80 for 15 minutes of sexual intercourse was established. A prostitution appointment was arranged to take place at a hotel located on Northampton Boulevard in Virginia Beach. Upon arrival, the VBPD Detective confirmed the agreement of $80 for 15 minutes of sexual intercourse with one of the two female occupants in the room.

21.     VBPD then searched the room and recovered small quantities of methamphetamine, cocaine, marijuana, along with several syringes with heroin residue. After being advised of their *Miranda* rights, the two occupants of the room stated they worked for DEVON JAY CALDWELL and several other individuals. The two occupants also stated that CALDWELL regularly provided them with narcotics, in order to keep them working.

**C.     Interview with Co-Conspirator #1**

22.     Co-Conspirator #1 (CC#1) was interviewed and stated that she began prostituting for CALDWELL in the spring of 2016. CC#1 stated that CALDWELL, whom she called "John John," posted her on Backpage.com, provided her hotel rooms in which to work, set the prices for her commercial sex acts, and collected the money at the end of her appointments, also referred to as "plucks."

23.     In the summer of 2016, CC#1 began assisting CALDWELL in his prostitution of other women. CC#1 was tasked with posting the women on Backpage.com, making sure the women had food, renting hotel rooms for the group's use, collecting money from the appointments, and providing marijuana, cocaine, methamphetamine, and heroin (supplied to her by CALDWELL) to the women. CC#1 explained that CALDWELL gave drugs to the women both to help them stay awake in order that they could take appointments late at night or early in the morning, as well as to reward them after they were done working. CALDWELL told CC#2 to withhold drugs from the women who did not want to work. On one occasion, CC#1 witnessed CALDWELL inject Jane Doe 1 with heroin.

24.     CC#1 estimated that, on any given night, CALDWELL had between 2 and 5 women working for him.

25.     CC#1 identified an email address affiliated with several Backpage.com postings affiliated with the group as belonging to CALDWELL.

**D.     Interview with Co-Conspirator #2**

26.     Co-Conspirator #2 (CC#2) was interviewed and stated he assisted CALDWELL in his prostitution business for approximately three months. CC#2 explained that CALDWELL taught him how to "work the phones" – meaning speak with customers who wanted to set up appointments based off of Backpage.com advertisements. CC#2 stated that CALDWELL set a quota of several hundred dollars per night for each woman involved in the prostitution operation. If the women failed to satisfy this expectation, CALDWELL would cut them off from using the drugs he afforded them, and would threaten to kick them out of the hotel rooms where they were staying. CC#2 estimated that CALDWELL was taking in at least $1,000 per night from the commercial sex activity.

27.     In addition to "working the phones," CC#2 stated that he also drove girls to out-call appointments, posted advertisements on Backpage.com, and collected money at the end of appointments. CC#2 would then provide the money to CALDWELL. CC#2 estimated that he

met between 6 and 8 different women working for CALDWELL, and that on any given night, CALDWELL had between 2 and 5 women working for him. CC#2 further estimated that he drove women to approximately 100 to 150 out-call appointments during his three months with CALDWELL.

28. CC#2 was also tasked with providing drugs to the women working for CALDWELL when CALDWELL was not present. CALDWELL would leave CC#2 quantities of drugs – to include cocaine, methamphetamine, and heroin – and would direct him to provide them to the women if they took their "plucks." CC#2 was instructed to withhold the drugs if a woman did not want to take an appointment.

29. CC#2 stated that he knew CALDWELL to frequently carry a gun, which CALDWELL referred to as a "pole," in order to ensure that the "plucks" paid for the commercial sex appointments.

30. CC#2 referred to CALDWELL by the nicknames "John John" and "Buzzo." Further, CC#2 identified an email address affiliated with several Backpage.com postings affiliated with the group as belonging to CALDWELL.

## CONCLUSION

31. Based on the foregoing facts, training, and experience, as well as your affiant's debriefings with cooperating witnesses and law enforcement witnesses, your affiant believes there is sufficient probable cause to charge that from in or about May 2016, to on or about August 19, 2016, DEVON JAY CALDWELL in and affecting interstate and foreign commerce, did knowingly recruit, entice, harbor, transport, provide, obtain, maintain, and advertise Jane Doe 1, knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or any combination of such means would be used to cause Jane Doe 1 to engage in commercial sex acts, in violation of 18 U.S.C. § 1591(a), and that during the same timeframe, DEVON JAY CALDWELL conspired with other persons to commit violations of 18 U.S.C. § 1591(a).

FURTHER YOUR AFFIANT SAYETH NOT.

_Peggy A. Roberts_
Peggy A. Roberts
Special Agent
Homeland Security Investigations

Subscribed and sworn before me this _17th_ day of November 2016, at Norfolk, Virginia.

_Robert J. Krask_
The Honorable Robert J. Krask
United States Magistrate Judge

5